IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 5, 2022

**STATE OF TENNESSEE v. DEVIN ROYCE KNIGHT**

**Appeal from the Circuit Court for Fayette County**
**No. 19-CR-108     J. Weber McCraw, Judge**

_____

**No. W2021-00159-CCA-R3-CD**

_____

A Fayette County jury convicted the Defendant, Devin Royce Knight, of attempt to commit first degree premeditated murder, aggravated domestic assault by strangulation, kidnapping, and vandalism under $1000, and the trial court imposed an effective twenty-two year sentence. On appeal, the Defendant asserts that the evidence is insufficient to sustain his convictions for attempt to commit first degree murder and kidnapping. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Joseph McClusky and William D. Massey (on appeal), Memphis, Tennessee, and Leslie A. Miller (at trial), Somerville, Tennessee, for the appellant, Devin Royce Knight.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen M. Chandler and Raven M. Icaza, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's domestic assault of his ex-wife,[1] Jeanette Loyd, inside her residence in Arlington, Tennessee. A Fayette County grand jury indicted the Defendant for attempted first degree premeditated murder, aggravated domestic assault by strangulation, kidnapping, violation of an order of protection, and vandalism under $1000.

---

[1] At the time of these offenses, the Defendant and the victim were married but living separately.

At trial, the parties presented the following evidence: On August 17, 2018, the Defendant and the victim went to dinner together at their church. Afterwards, they drove back to the victim's residence. During the drive, the Defendant accused the victim of being dishonest with him during the course of their marriage. When they arrived at the victim's residence, the victim asked the Defendant to leave because she thought he was acting "weird." The Defendant replied that he could not go home because he had told his parents he would be gone all weekend. Eventually, the Defendant left the victim's residence, but he later called the victim to ask if he could return to retrieve contact solution. She agreed and, when he arrived, she told him she did not want to argue with him any further and gave him the option to either leave or sleep on the couch. The victim then went to bed.

The next morning, the victim found the Defendant on the couch. He looked tired and stated that he had not slept well. The victim offered for the Defendant to "go lay down," but he declined saying that he had "plans." The victim wanted the Defendant to spend the day with her, but she went to the kitchen and made breakfast for the two of them. When she returned with a plate of pancakes for the Defendant, he was asleep in the recliner. The victim ate her breakfast while the Defendant slept, and then she began cleaning her home. She checked on the Defendant periodically as she cleaned but found him still asleep.

At about 5:00 p.m., when the victim began cleaning her bedroom, the Defendant appeared in the doorway, angry that she had allowed him to sleep all day when she knew he had "plans." The Defendant was "really mad" and ordered the victim to remove her clothing, saying that she "owed him sex." Initially she declined, but when the Defendant reached for her to remove her clothing, she acquiesced saying she would undress herself. The Defendant forced her down onto the bed and "[w]hen he was finished," The victim gathered her belongings to leave but instead told the Defendant, "you got what you wanted. You can leave." The Defendant took the victim's phone and, when he refused to give it back to her, she began walking down the hallway. When she reached the living room, he pushed her down in the recliner and jumped on top of her.

The victim begged the Defendant to get off of her because he was hurting her. The Defendant replied, "it d[oes]n't matter, [you] are going to die today." He told the victim that he was tired of all the lies she had told him during the marriage. He said that he knew the victim lied when she claimed she was taking a nap because "on Facebook a green light was on." The victim did not understand the Defendant's allegation or to what he was referring. As she remained pinned beneath him on the recliner, the Defendant pulled out a knife and held it to her throat. He told the victim that she had better ask Jesus for forgiveness because she was not the godly woman she claimed to be. The victim begged the Defendant to allow her to call her "boys" to say goodbye. He denied her request, responding, "Your boys don't care about you."

2

The Defendant placed the knife to the victim's temple. The victim began reciting scripture, and the Defendant ordered her to "shut up." The victim felt "a couple of pops" like her bone was breaking. She then felt really hot. She initially believed she was sweating but then realized it was blood. The Defendant then put the knife to the victim's throat and told her he was going to slit her throat. He asked the victim to count backward from three. When she said she could not do that, the Defendant placed his arm across her chest and throat and began pushing harder and harder. The victim grabbed at the Defendant's arm trying to get air. The Defendant released the pressure briefly but then reapplied pressure on her throat and chest with his arm. The victim freed one of her arms and unsuccessfully attempted to gouge the Defendant's eye. The Defendant retaliated by hitting the victim in the mouth, knocking a tooth loose.

The victim then changed tactics, trying to appeal to the Defendant by telling him that she loved him and agreeing that she was "crazy" and needed to go to "Lakeside." The Defendant responded that it was "too late," and he bit her arm. The victim said that it felt like the Defendant "ripped the meat out of it" and that she experienced extreme pain. The Defendant asked the victim where she kept the key to the gun safe. Knowing she did not keep the gun loaded, she told him the location of the key. As he walked away to get the key, she fled to the neighbor's residence. The neighbor hid the victim and contacted the police.

The victim had surveillance cameras inside her home and recordings from the day of the incident were shown to the jury. The recording shows the Defendant covering the lens of the surveillance camera with a cloth. The victim was transported to the hospital where she received treatment for her injuries from the altercation with the Defendant.

The victim and the Defendant were separated before this incident and had been attempting to reconcile on the weekend of this incident. She had earlier, on June 17, 2013, obtained an order of protection against the Defendant in Florida. The order of protection was in effect at the time of this incident. Although the Defendant was not present at the hearing on the order of protection, the victim knew the Defendant was aware of the order because he called her asking why she had sought an order of protection against him after he received a copy of it.

The victim reported damage to her "Iwatch" and a Herringbone necklace that occurred when the Defendant strangled her. The approximate value of the damaged items was $290.00. The victim had physical injuries that included punctures to the temple area of her head, a puncture to her neck, scratches and bruising to her neck, a bruise on her left arm, cuts on her hands, and bruising around her neck and on her chest. Photographs of her injuries were shown to the jury. Following treatment at the hospital, the victim had

3

"extensive dental work" due to the tooth the Defendant loosened when he hit her. She also sustained some hearing loss in her left ear, for which she wore a hearing aid.

On cross-examination, the victim agreed that she was aware of the Defendant's "mental problems." She had witnessed one of his suicide attempts. The victim was also aware that the Defendant had a "drinking problem" and that he took antidepressants, "some sort of powder from China," and blood pressure medication.

At the time of these events, the victim's neighbors were having a family gathering. Their granddaughter, Lacey King, called the police at the victim's request. Ms. King observed "a gash" on the side of the victim's face, cuts on her hands, and a bite mark on the victim's arm. She also noticed red marks around the victim's neck. Ms. King described the victim as unnerved and scared. Ms. King observed a man exit the victim's residence, enter a truck, and drive away.

Fayette County Sheriff's Department Deputy Daniel Ramsur responded to a call about this disturbance. Deputy Ramsur spoke with the victim outside the neighbor's residence. He observed cuts on the left side of her face, her fingers, palm, and left forearm. He recalled that the victim had red marks on her chest and neck, a scrape on her neck, and a bruise on her arm. He described the victim as "really upset." As The victim recounted the events, she mentioned the gun. Deputy Ramsur inquired about the location of the gun and then went inside the residence to see if the gun had been taken. He found the gun safe locked under the bed. The victim told him that if the safe was locked, the gun was still there.

Michael Pryor, a licensed paramedic, attended to the victim's wounds on the drive to the hospital. He noted bleeding to the temple area of her forehead. He described the victim as "distraught" and "emotional." Mr. Pryor observed "severe redness" around the victim's neck. En route to the hospital, he cleaned and bandaged the victim's wounds.

After the close of the State's case-in-chief, the Defendant presented no proof.

After hearing this evidence, the jury convicted the Defendant of attempt to commit first degree premeditated murder, aggravated domestic assault by strangulation, kidnapping, and vandalism under $1,000. At a subsequent sentencing hearing, the trial court sentenced the Defendant to serve an effective sentence of twenty-two years. It is from these judgments that the Defendant now appeals.

## II. Analysis

4

On appeal, the Defendant asserts that the evidence is insufficient to sustain his convictions for attempt to commit first degree premeditated murder and kidnapping. He argues that the State failed to present evidence that he took a substantial step in furtherance of first degree murder. He also argues that the State failed to show that the kidnapping was not incidental to the aggravated assault. The State responds the evidence is sufficient to support the jury's verdicts. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary

5

instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## A. Attempt to Commit First Degree Premeditated Murder

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018). A person attempts to commit first degree murder when he or she acts with intent to knowingly "cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or acts knowingly "to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(2)-(3) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*,

102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the Defendant covered the lens of a surveillance camera in the victim's home on the day of this incident. After instigating an argument with the victim, he took the victim's cell phone and followed her down the hallway as she attempted to leave. In the living room, he pushed her into a recliner and jumped on top of her causing her pain. The victim pleaded with the Defendant to stop hurting her, but the Defendant only responded with threats of killing the victim. The Defendant held a knife to the victim's throat and then stabbed the victim in the side of her head. The victim described feeling "pops" and then blood. The Defendant returned the knife to the victim's throat and again threatened to kill her by "slit[ting] her throat." The Defendant placed his arm against the victim's chest and throat cutting off the victim's air supply. When the victim tried to fight back, the Defendant hit the victim in the face, loosening one of her teeth. In order to protect herself, the victim then attempted to appease the Defendant by professing her love for him and agreeing with his assertions that she was "crazy." The Defendant responded by biting the victim, which she described as feeling as though the Defendant "had just ripped the meat out of it." Having unsuccessfully stabbed or suffocated the victim, the Defendant asked for the location of the key to the victim's gun safe. After she provided the location he went to retrieve the key and the victim fled to a neighbor's residence where the police were notified.

Based upon this evidence, a jury could reasonably conclude that the Defendant intended to kill the victim when he repeatedly threatened to take her life, held a knife to her throat, cut her temple, cut off her air supply by applying pressure to her chest and throat, and, when his earlier attempts were unsuccessful, going to retrieve a gun. We are unpersuaded by the Defendant's argument that because the Defendant did not successfully kill the victim with his knife, he did not attempt to kill her.

Accordingly, we conclude that the evidence is sufficient to show that the Defendant acted intentionally and with premeditation when he attempted to stab and suffocate the victim. A rational jury could reasonably conclude beyond a reasonable doubt that these actions by the Defendant constituted a substantial step toward the first degree murder of the victim. The Defendant is not entitled to relief as to this issue.

## B. Kidnapping

Kidnapping occurs when a Defendant knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty, under circumstances that

expose the other person to substantial risk of bodily injury. T.C.A. § 39-13-302(a); §39-13-303(a) (2018).

The Defendant argues that the "kidnapping was merely incidental to the aggravated assault." In Tennessee, appellate analysis of such an issue is a standard sufficiency of the evidence review of a properly instructed jury's assessment of the facts. *State v. White*, 362 S.W.3d 559, 578 (Tenn.2012). In this case, the trial court properly instructed the jury, consistent with *White*, that the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of attempted murder or aggravated assault, the other offenses charged in this case. It is the jury's "primary obligation" to determine whether the confinement was merely incidental to the other felonies charged. *Id.* at 577. The trial court properly instructed the jury and juries are presumed to follow the instructions of the trial court. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008).

To ensure that the jury can carry out its function of protecting a defendant's due process rights when considering whether the State has proven each and every element of a kidnapping charge that arises out of the same conduct against the same victim of an accompanying felony, the *White* court delineated the following jury instruction:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
> • whether the removal or confinement occurred during the commission of the separate offense;
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

8

- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*White,* 362 S.W.3d at 578 (footnote omitted).

The evidence, viewed in the light most favorable to the State, showed that the Defendant took the victim's cell phone prior to pushing her into a recliner and holding her down despite her pleas to be released. Thereafter, the Defendant physically attacked the victim, stabbing her, attempting to suffocate her, and biting her, all while he restrained her in the recliner. The evidence showed that the Defendant interfered with the victim's liberty by confinement to the recliner and the removal of her cell phone, and that the interference was not necessary to the other felonies charged nor inherent in the other charges. The removal of the victim's cell phone prevented the victim from summoning assistance and reduced the risk of detection of the Defendant's crimes against the victim. The prolonged confinement of the victim by the Defendant increased the victim's risk of harm as it allowed for the Defendant's continual attack on her.

Accordingly, we conclude that there was sufficient evidence for a properly charged jury to find that the Defendant restricted the victim's liberty and exposed her to substantial risk of bodily injury. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

9